# 14-2410-cv

*To Be Argued By:*
WESLEY W. HORTON

## IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

**ORSON D. MUNN, III, AS PARENT & NEXT FRIEND OF C.M. & IND.,
CHRISTINE MUNN, AS PARENT & NEXT FRIEND OF C.M. & IND., CARA L. MUNN,**
*Plaintiffs-Appellees,*

**v.**

**THE HOTCHKISS SCHOOL,**
*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## PAGE PROOF BRIEF OF DEFENDANT-APPELLANT

| | |
|---|---|
| *WESLEY W. HORTON | AARON S. BAYER |
| KAREN L. DOWD | JEFFREY R. BABBIN |
| KENNETH J. BARTSCHI | WIGGIN AND DANA LLP |
| HORTON, SHIELDS & KNOX, P.C. | 265 Church Street |
| 90 Gillett Street | New Haven, CT 06510 |
| Hartford, CT 06105 | (203) 498-4400 |
| (860) 522-8338 | |

*Attorneys for Defendant-Appellant*

*Counsel of Record

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, The Hotchkiss School hereby states that it is a non-stock corporation. It has no parent corporation and no publicly-held corporation owns 10% or more of The Hotchkiss School.

# TABLE OF CONTENTS

**Page**

Table of Authorities ......................................................................... iii

Jurisdictional Statement .................................................................... 1

Statement of Issues ........................................................................... 2

Statement of the Case ....................................................................... 3

Summary of Argument ...................................................................... 6

Argument ........................................................................................... 8

Conclusion ......................................................................................... 57

# TABLE OF AUTHORITIES

CASES                                                                 PAGE

*23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174 .................13
     (2d Cir. 2012)

*Altamuro v. County of Nassau,* 33 F.App'x. 556 (2d Cir. 2002)........................45

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 .......................28, 37, 39
     (7th Cir. 2002)

*Bhatia v. Debek*, 948 A.2d 1009 (Conn. 2008)......................................................54

*Buckman v. People Express, Inc.*, 530 A.2d 596 (Conn. 1987)...........................53

*Champagne v. Raybestos-Manhattan, Inc.*, 562 A.2d 1100 (Conn. 1989)...........54

*Cowles v. Doelger*, 2005 WL 4841411 (Conn. Super. Ct. 2005) .......................56

*Crotta v. Home Depot, Inc.*, 732 A.2d 767 (Conn. 1999).....................................50

*D'Attilo v. Viscarello*, No. X10 UWY-CV-05-4010135-S (Conn. Super. ..........56
     Ct. 2011)

*Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993) .............28, 29, 31

*David v. City of New York*, 835 N.Y.S.2d 377 (N.Y. App. Div. 2007) ..............23

*DiPietro v. Farmington Sports Arena, LLC*, 49 A.3d 951.................. 10-11, 16, 34
     (Conn. 2012)

*Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384 (2d Cir. 1975)......................13

*Film v. Downing & Perkins, Inc.,* 66 A.2d 613 (Conn. 1949)..............................25

*First Union Nat'l Bank v. Benham*, 423 F.3d 855 (8th Cir. 2005) ......................36

*Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415 (1996)...............................53

**CASES**                                                        **PAGE**

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ...........................................33

*Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79 (1st Cir. 2010)................................13

*Gurguis v. Frankel*, 888 A.2d 1083, *cert. denied,* 895 A.2d 789 .................44, 45
(Conn. 2006)

*Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734 (Conn. 2005)...... 47, 48, 49-50

*Horowitz v. YMCA Camp Mohawk, Inc.*, 3:13-cv-01458-SRU (D.Conn. 2013)..21

*Hyson v. White Water Mountain Resorts of Conn. Inc.*, 829 A.2d 827 .......... 47-48
(Conn. 2003)

*In re Air Cargo Shipping Services Antitrust Litigation*, 697 F.3d 154 .................9
(2d Cir. 2012)

*ING Global v. United Parcel Service Oasis Supply Corp.*, 757 F.3d 92 ..........9, 40
(2d Cir. 2014)

*Israel v. State Farm Mut. Auto. Ins. Co.*, 293 F.3d 595 (2d Cir. 2002) ...............46

*Jacobs v. Yale Univ.*, 2000 WL 1530030 (Conn. Super. Ct. 2000) ............... 55-56

*Jaworski v. Kiernan,* 696 A.2d 332 (Conn. 1997) .................................................16

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................................28, 29

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681 (2001) ..............................................33

*LePage v. Horne,* 809 A.2d 505 (Conn. 2002) .............................................. 25-26

*Lodge v. Arett Sales Corp.,* 717 A.2d 215 (Conn. 1998) ................... 19, 23-24, 28

*Lombard v. Edward J. Peters, Jr., P.C.*, 749 A.2d 630 (Conn. 2000)........... 18-19

*Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290...............33
(2d Cir. 2008)

CASES                                                                         PAGE

*Mancha v. Field Museum of Natural History*, 283 N.E.2d 899 (Ill. App. ..........23
    Ct. 1972)

*Marfia v. T.C. Ziraat Bankesi*, 147 F.3d 83 (2d Cir. 1998) .................................45

*Mazurek v. Great American Ins. Co.*, 930 A.2d 682 (Conn. 2007) .....................10

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ...............................36

*Monk v. Temple George Assoc., LLC*, 869 A.2d 179 (Conn. 2005) ............. 19-20

*Munn v. Hotchkiss*, 933 F.Supp.2d 343 (2013)......................................................4

*Myklatun v. Flotek Industries, Inc.*, 734 F.3d 1230 (10th Cir. 2013) ..................45

*NLRB v. Canning*, 134 S.Ct. 2550 (2014) ...........................................................13

*Okoi v. El Al Israel Airlines*, 378 F.App'x. 9 (2d Cir. 2010)...............................13

*Oliveri v. Delta Steamship Lines, Inc.*, 849 F.2d 742 (2d Cir. 1988) ..................57

*Omni v. Sonitrol Corp.*, 476 F.Supp.2d 125 (D.Conn. 2007) ..............................49

*Paige v. St. Andrew's Roman Catholic Church Corp.*, 734 A.2d 85.............. 44-45
    (Conn. 1999)

*Palsgraf v. Long Island R.R. Co.,* 162 N.E. 99 (N.Y. 1928).................................16

*Perera v. Attorney General United States*, 536 F.App'x. 240 (3d Cir. 2013) .....13

*Polski v. Quigley Corp.*, 538 F.3d 836 (8th Cir. 2008)................................... 32-33

*Pouliot v. Paul Arpin Van Lines, Inc.*, 235 F.R.D. 537 (D.Conn. 2006) .............55

*RK Constructors, Inc. v. Fusco Corp.,* 653 A.2d 153 (Conn. 1994)....................19

*Rodriguez v. Board of Education,* 480 NYS.2d 901 (N.Y. App. Div. 1984) .......36

| CASES | PAGE |
|---|---|

*Rodriguez v. Testa,* 993 A.2d 955 (Conn. 2010) ..................................................48

*Rothstein v. Carriere,* 373 F.3d 275 (2d Cir. 2004)..................................................9

*Saladino v. American Airlines*, 500 F.App'x. 69 (2d Cir. 2012) .........................54

*Saladino v. Stewart & Stevenson Servs., Inc.*, 2011 WL 284476, at *3 ........ 54-55
    (E.D.N.Y.)

*Saleh v. Ribeiro Trucking, LLC*, 32 A.3d 318 (Conn. 2011) ...............................54

*Sic v. Nunan*, 54 A.3d 553 (Conn. 2012) ..................................... 10, 16, 17, 26, 28

*Stampf v. Long Island R. R. Co.*, 761 F.3d 192 (2d Cir. 2014)..................9, 40, 51

*Stedman v. O'Neil,* 72 A. 923 (Conn. 1909) .........................................................25

*U.S. v. Coppola,* 671 F.3d 220 (2d Cir. 2012), cert. denied, 133 S.Ct. 843 .........24
    (2013)

### STATUTES

C.G.S. §10-27(a)..................................................................................................20, 49

28 U.S.C. §1332(a)  ..................................................................................................1

28 U.S.C. §1291  ......................................................................................................1

### RULES

Fed. R. Civ. Proc. 50 ........................................................................3, 9, 40, 45

Fed. R. Civ. Proc. 59 ....................................................................3, 9, 37, 40, 45

Fed. R. Evid. 702 ...................................................................................... 28-29

**Page**

**OTHER AUTHORITIES**

Prosser, Treatise on Torts.................................................................25, 26, 27

www.tripatini.com .....................................................................................31

https://web.archive.org/web/20070525051905/http://wwwn.cdc.gov/.................13
    travel/destinationChina.aspx

67A C.J.S. Parent and Child § 337.......................................................51

## JURISDICTIONAL STATEMENT

Defendant-Appellant, The Hotchkiss School, is a Connecticut nonprofit corporation with its principal place of business in Lakeville, Connecticut. Plaintiffs-Appellees, Cara Munn, Orson D. Munn, III, and Christine Munn, are citizens of New York. The District Court had jurisdiction pursuant to 28 U.S.C. §1332(a).

This Court has jurisdiction pursuant to 28 U.S.C. §1291 because the appeal arises from a final judgment of the District Court entered on April 9, 2013 and reduced for collateral source payments when the court denied defendant's Rule 50 and 59 motions on June 5, 2014. A timely notice of appeal was filed on July 2, 2014.

# STATEMENT OF ISSUES

I.     Should defendant have foreseen harm of the general nature plaintiff sustained, and does Connecticut public policy disfavor imposing a duty in the circumstances of this case?

II.    Did the charge directing the jury to consider the gravity of the harm in the midst of the charge on foreseeability mislead the jury?

III.   Did the court erroneously and prejudicially strike defendant's expert's entire testimony on standard of care, while permitting plaintiff's unqualified experts to testify?

IV.    Could the jury conclude, without speculation, that plaintiff proved she was infected with TBE on Mt. Pan?

V.     Did the "release of claims" unambiguously release defendant from liability, and if so is the release consistent with Connecticut public policy?

VI.    Is the $31,500,000 noneconomic award excessive?

## STATEMENT OF THE CASE

This appeal arises from a $41 million verdict holding a secondary school responsible under Connecticut tort law for one of its students being bitten by a tick during a school-run trip to China and thereby contracting a serious insect-borne disease[1] that was unprecedented among American travelers. The student and her parents sued defendant, claiming negligence in the planning of the trip and in her supervision. The case was assigned to Judge Stefan R. Underhill. Defendant unsuccessfully moved for summary judgment, claiming that her injuries were unforeseeable, that public policy showed that defendant violated no duty to plaintiffs, and there was no evidence she was infected where she claimed (DN.115, 138). The case was then tried to a jury. At the end of plaintiffs' case, defendant unsuccessfully made an oral Rule 50(a) motion (T.1200-02).

The jury found for plaintiffs and awarded $10.25 million in past and future economic damages and $31.5 million in noneconomic damages. Judgment for $41,750,000 entered on April 9, 2013 (DN.199). Defendant then moved for judgment under Rule 50(b), for a new trial under Rule 59, and to reduce economic damages for collateral source payments (DN.206, 207, 209). On June 5, 2014, the court denied the motions but approved a collateral source stipulation (MOD. to be

---

[1] Ticks are arachnids but were treated as insects by the court and parties.

published in ___F.Supp.2d). An amended judgment entered for $41,465,905.39 (DN.259).

At trial before the jury, the following evidence was admitted or undisputed: In March and April of 2007, defendant, The Hotchkiss School, provided students and families, including 15-year-old Cara Munn (hereafter, plaintiff) and her parents, with information on the China trip. A packing list included bug spray; another document included a "Release of Claims," which plaintiff and her mother signed (DN.143, Ex. C) and which the court held during the trial to be unenforceable (DN.177, reported at 933 F.Supp.2d 343 (2013)). In preparing for the trip, defendant consulted the Centers for Disease Control (CDC) website for China (T.242), and assigned a faculty member native to the area to be visited as tour leader (T.491, 498, 543-44).

On June 10, students and faculty members left for China to attend classes and visit various sites in the Tianjin region, near Beijing. On June 23, they traveled about 60 miles to the Mt. Pan[2] area of the Tianjin region. They visited the Great Wall and various other sites and also walked up Mt. Pan. Most of the group took a cable car down, but plaintiff and two others chose to walk down (MOD.4).

Plaintiff testified she got bug bites on her left arm on Mt. Pan and they began to itch right after she got off Mt. Pan; she also said she got bites on her legs before

_____

[2] Also called Mt. Panshan.

4

the Mt. Pan visit and would not know if she had a tick on her (T.1034-37). On July 3, she awoke with flu-like symptoms; her condition deteriorated rapidly and she eventually was airlifted to a New York hospital (MOD.5-6). Sometime after her hospitalization, she was diagnosed with tick-borne encephalitis (TBE) (Ex. 34). According to the CDC, she is the first American traveler ever to contract TBE in China (*id.*). As a result, she suffered permanent limitations on her speech and control of her face and some cognitive deficits.

The case was tried and submitted to the jury on the claims that defendant failed to warn plaintiff properly of the risks of insect-borne diseases and failed to require proper protective clothing or insect repellent (DN.79). For reasons known only to plaintiff, she chose to try her case solely on the specific theory that she was infected by a tick on Mt. Pan, not at any other site in China; the parties agreed to submit an interrogatory to the jury requiring a finding that plaintiff had proved the TBE bite occurred *on* Mt. Pan (T.3/26, 1451, 1499-1500, 1560-62).[3]

The jury found that defendant was negligent in failing to warn plaintiff of the risk of insect-borne diseases and in failing to ensure that she used protective measures against insect-borne infections; that she was infected by an insect-borne disease while on Mt. Pan; that one or more of defendant's negligent acts were the

---

[3] As transcripts for 3/25 and 3/26 start at the same number, they are specially noted herein.

cause-in-fact of her injuries; that those negligent acts were a substantial factor, alone or in conjunction with other factors, in causing her injuries; and that she was not negligent (T.1560-62).

Because the injury was not foreseeable, because making a school liable on the facts of this case is against public policy, because plaintiff failed to prove her case, and for other reasons, this Court should reverse and direct judgment, or order a new trial or remittitur.[4]

## SUMMARY OF ARGUMENT

There were no industry standards in June 2007 concerning the standard of care of a secondary school to warn of or protect its students from insect-borne diseases on school-sponsored trips. Moreover, the government advisories in effect at the time on the health risks associated with travel in China would not have put defendant on notice of the reasonable foreseeability of harm of the same general nature as TBE. Therefore, there is no basis for imposing on defendant a duty to warn or to protect against the harm that plaintiff incurred. Schools may be required to consult the CDC

---

[4] Early in its postjudgment decision the court highlights insignificant evidence against defendant. The court twice says the trip to Mt. Pan was listed as part of a city tour (MOD.3). However, the other pretrip materials would have quickly disabused participants of the idea that Mt. Pan is in a city (Ex.10, Ex.11). Also, the court says defendant sent families to the wrong CDC website (MOD.3). Defendant in a number of other documents referred them to the CDC or the State Department concerning the China trip (Exs.19, 507). No reasonable person would have been misled for more than a minute or two by the one inaccurate web address.

advisories, which are treated as authoritative. But there is no standard requiring schools to conduct general searches of unpublicized risks as yet unidentified by the CDC. Moreover, public policy militates against imposing a duty on schools to seek out information on such remote risks.

Even if there was sufficient evidence of foreseeability, the jury charge on that element misled the jury to believe that the gravity of harm affects whether the harm was foreseeable, thereby allowing a duty to be imposed even if the risk is not an appreciable one.

The court also issued numerous contradictory decisions on the parties' standard of care experts. First, it permitted plaintiff's two experts on that subject to testify even though they had no background in the standard of care for secondary schools, with her principal expert admitting, "No, that's not my area of expertise." Second, after initially allowing defendant's expert, who had extensive experience operating secondary school-sponsored trips, to testify for about 90 minutes, the court improperly struck all of his testimony on the grounds it was anecdotal and he was not telling the truth. Those points were grist for cross-examination, not striking the testimony. The leniency the court showed plaintiff's standard of care experts stands in sharp contrast to its treatment of defendant's expert. The striking of defendant's expert left it defenseless on the important, indeed central, issue of standard of care.

On the issue of causation, the case was tried, submitted, and decided by the jury solely on the basis of plaintiff's claim that she was infected on Mt. Pan. The jury could not have reached that conclusion without speculation because plaintiff admittedly had been bitten by insects at other locations she visited in China at times also within the incubation period for TBE.

Three months before the trip, plaintiff and her mother received extensive information about the planned trip and signed a release from liability that was clear enough to put a reasonable person on notice of its meaning. The court erroneously invalidated the release on the grounds it was ambiguous and contrary to Connecticut public policy. In reaching those conclusions, the court effectively expanded Connecticut law on invalidating releases from negligence liability.

The award of $31,500,000 in noneconomic damages is like saying plaintiff is one of the most grievously injured parties in the history of Connecticut law. Yet despite her injuries, plaintiff became a student at a highly-ranked college, and is active in journalism, sports, and foreign travel. The award, which the court refused to reduce based on an inapt comparison to cases involving birth injuries, paraplegics, and quadriplegics, shocks the conscience.

## ARGUMENT

I. **Defendant Should Not Have Foreseen Harm of the General Nature Plaintiff Sustained, and Connecticut Public Policy Disfavors the Duty Imposed on Defendant.**

Standard of Review:  Rule 50, De novo, *Stampf v. Long Island R. R. Co.*, 761 F.3d 192, 197 (2d Cir. 2014); Rule 59, Abuse of discretion, *ING Global v. United Parcel Service Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).

The court holds that every secondary school in Connecticut has a duty to protect the health and safety of its students (MOD.13).  Defendant, an independent boarding school, firmly agrees with that general proposition.  But the duty of a secondary school to anticipate an insect-borne disease of the same general nature as plaintiff's – namely, a *serious* insect-borne disease – where there are no industry standards, the government advisories do not indicate such a risk, and there are no other factors defendant should have considered, is an important question of Connecticut law on which no case controls.  The court should have granted judgment as a matter of law.[5]   In any event, this issue warrants certification to the Connecticut Supreme Court.

_____

[5] Defendant raised the issue of its duty in its Rule 50(a) and 50(b) motion (T.1200-01; DN.206).  The court incorrectly states that defendant "likely waived" the public policy prong of its argument by not stating it specifically in its Rule 50(a) motion, but the duty is to raise *issues* (MOD.53).  The public policy argument is simply further support of defendant's claim that it had no legal duty under the circumstances.  See *In re Air Cargo Shipping Services Antitrust Litigation*, 697 F.3d 154, 161 n.3 (2d Cir. 2012) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.") (internal quotation marks omitted).  Public policy is also before this Court because it was a legal issue raised in the summary judgment motion and on review of the denial of defendant's Rule 59 motion claiming the jury reached a seriously erroneous result. *Rothstein v. Carriere,* 373 F.3d 275, 284 (2d Cir. 2004).

The test for whether there is a legal duty requires two distinct considerations: whether a duty exists and, if so, the scope of that duty. *Sic v. Nunan*, 54 A.3d 553, 558 (Conn. 2012).

> [T]he test for the existence of a legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.

*Id.* (quoting *Mazurek v. Great American Ins. Co.*, 930 A.2d 682, 690 (Conn. 2007)).

### **Foreseeability**

No school in defendant's position would have anticipated that a student would contract a serious insect-borne illness like TBE on the trip to China. In assessing what defendant knew or should have known, a court should note there were no industry standards in June 2007 concerning secondary school-sponsored trips. Plaintiff's standard of care expert Peter Tarlow admitted he knew of no such standards; he constructed his own standard, as the court put it, by hypothesis (MOD.61). Defendant's director of travel programs in 2007 agreed there were no such standards (T.270).

In *DiPietro v. Farmington Sports Arena, LLC*, 49 A.3d 951 (Conn. 2012), the Connecticut Supreme Court held that an indoor soccer arena was entitled to summary judgment where plaintiff was injured by a latent defect in the artificial

playing surface. Without a visible defect, industry standards, or governmental regulations putting defendant on notice that it would be required to test for the defect, defendant had no duty to check with an expert on artificial playing surfaces or to engage in other investigations such as scientific testing to determine the appropriateness of the carpet it chose. Expert testimony that the flooring was unreasonably dangerous and that scientific testing would have revealed this danger was unavailing. *Id.* 959.

Although *DiPietro* involved premises liability, the Connecticut Supreme Court would likely apply its logic here. In the absence of industry standards as to what a school should do regarding insect protection, a reasonable inquiry into relevant government advisories in effect in June 2007 would not have put the school on notice of what could fairly be characterized as a latent danger. Defendant had no duty to investigate further, just as the arena had no duty to test the carpet in *DiPietro*.

Plaintiff's case focused on three serious insect-borne diseases, TBE, Japanese encephalitis (JE), and Lyme disease, to show that injury of the same general nature as plaintiff's was foreseeable to defendant.[6]

---

[6] These are the only diseases plaintiff's expert Dr. Stuart Rose considered (T.720). While the CDC advisories also refer to the risk of malaria, dengue, filariasis, leishmaniasis, plague, and onchocerciasis, East Asia and China include tropical areas, and these mostly are tropical diseases not found in the Tianjin region (T.731) (Rose dismissing malaria, dengue, and leishmaniasis). Rose did not mention filariasis, plague, or onchocerciasis. It is undisputed that Mt. Pan is nowhere near a tropical region (*id.*).

11

It is undisputed that the CDC is the "primary source for assessing travelers' health risks abroad" (MOD.24). Two CDC advisories were in evidence. The advisory for East Asia, dated April 13, 2007 (Ex.9), which includes China, does not even mention TBE. Plaintiff's case turned on an advisory for China dated August 1, 2007 (Ex.546) – *after* the trip – that mentions TBE in one sentence: "Tickborne encephalitis occurs in forested regions in Northeastern China and in South Korea." However, another China advisory, dated May 23, 2007 – *before* the trip but not in evidence – does not mention TBE at all. Finally, a CDC publication in 2010 states that plaintiff's case "is the first reported case of TBE in a U.S. traveler returning from China." (Ex.34, p.2). [7]

All three advisories mention that JE occurs in "this region" or "East Asia," but, in a section on vaccines and shots, they all explain the concern as follows: "<u>Japanese encephalitis</u>, if you plan to visit rural farming areas and under special circumstances, such as a known outbreak of Japanese encephalitis." There is no evidence that the trip included a visit to rural farming areas or that there was a known outbreak of JE. None of the advisories mentions Lyme disease at all.

Although not in evidence, this Court should take judicial notice of the pretrip China advisory issued by the CDC in May 2007, which is found at

---

[7] Rose's own website, reflecting studies for a 10-year period before 2007, revealed no known cases of *any* traveler to China contracting TBE (T.732).

https://web.archive.org/web/20070525051905/http://wwwn.cdc.gov/travel/destinati
onChina.aspx. (See attached addendum).  The May 2007 CDC China advisory,

which is consistent with the April 2007 CDC East Asia advisory in evidence, is an

official government publication, and the archived web page of that publication

(retrieved from the internet archive known as the "Wayback Machine") is reliable

and relied upon by courts.  Indeed, the post-trip August 2007 CDC advisory that was

in evidence and was relied upon by the court is itself an archive from the Wayback

Machine (Ex.546).

Circuit courts have taken judicial notice of similar government publications.

*See Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (Circuit Court

taking judicial notice of CDC's website); *Perera v. Attorney General United States*,

536 F.App'x. 240, 242 n.3 (3d Cir. 2013) (same of Wayback Machine of older

government passport documents); *Okoi v. El Al Israel Airlines*, 378 F.App'x. 9, 11

n.1 (2d Cir. 2010) (same of excerpts from a government publication); cf. *23-34 94th

St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 n.7 (2d Cir. 2012)

(same of private website); *Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384, 390

(2d Cir. 1975) (same of facts of life, including high cost of living in D.C.).  *See also

NLRB v. Canning*, 134 S.Ct. 2550, 2589 (2014), where the Supreme Court noticed

private print or online sources in appendix B, notes 3,4,12,14 and 19.

The CDC advisories available before the trip did not put defendant on notice

that a serious insect-borne disease was a foreseeable risk in the areas they visited. Plaintiff did not prove otherwise, having only relied on the August 2007 advisory mentioning TBE. While the court inferred that this advisory was in effect before the trip (MOD.24), the earlier East Asia and China advisories show that inference to be mistaken.

Even if the pretrip China advisory is not considered, the evidence for such an inference is insufficient. David Thompson, Director of the Hotchkiss International Travel Program, stated he believed he saw information on the China page about a risk of TBE in Northeast China "at the time of this trip" but immediately followed up with "perhaps, I know there's something there now. I'm not sure, I can't recall if, in 2007. But I know that it wasn't Tianjin, and where they were in Tianjin was not part of that definition of Northeastern China." (T.249).[8] Plaintiff's subsequent questioning of him was about the August advisory (T.250-53). Plaintiff's examination of experts for both sides also concerned the August advisory (T.666-67; 1246-53). The evidence was insufficient to permit an inference that the pretrip China advisory mentioned TBE.

There is no evidence defendant had actual knowledge in the spring of 2007 of the presence of serious insect-borne diseases in the Tianjin region. Nor is there

---

[8] Thompson apparently was recalling a book by Dr. Rose (Ex.591), because he later explained that Rose's book showed that the portions of China that had issues with TBE were far from Tianjin (T.265-66).

14

evidence of publicity in the press of such diseases at the time. Nor is there anything in the CDC advisories to suggest a need to make further inquiry. Nor was defendant aware of unusual susceptibility of any of the student-travelers to such diseases that might have required extra inquiries. Nor did any other U.S. agency (such as the State Department) have any medical alert concerning China. Nor was the defendant's notice to participants to have insect repellent – a notice presented in a low-key manner, as the court observes (MOD.3) – probative of anything more than a desire to provide for the participants' comfort.

The court points to two other sources that purportedly made a serious insect-borne disease foreseeable, namely, travel medicine reports consulted by doctors and commercial trip planners and a British health advisory indicating that TBE occurs "in forested regions of China and Japan." (MOD.26-27). The source the court references is Travax.com, a travel medicine site created by Dr. Rose (T.619). He testified that travel medicine doctors use this source but there is no evidence that anyone other than such doctors used Rose's website, available only by paid subscription, although Rose opined defendant should have consulted it (T.650-52).

Because it is undisputed that the CDC was authoritative as to health hazard warnings, it would be unreasonable to expect secondary schools to consult subscription-only medical websites for advice on traveling abroad, especially where the CDC provides such information to the general public.

Similarly, there is no evidence that defendant should have been consulting advisories of other governments. While plaintiff may urge a world-wide search of health advisories, that is not required. Just as in *Sic* (where the driver had no duty to look beyond legal requirements of drivers in deciding how to position his tires while stopped to make a left turn), and just as in *DiPietro* (where the soccer arena had no duty to look beyond industry standards and government regulations), it would be imprudent to require schools to second-guess the CDC. It is fundamental that duty extends only to the "range of reasonable apprehension" of danger, requiring a plaintiff to prove "that the act as to him had possibilities of danger so many and apparent as to entitle him to be protected against the doing of it though the harm was unintended." *Palsgraf v. Long Island R.R. Co.,* 162 N.E. 99, 101 (N.Y. 1928).

But the court went further. Its decision construes foreseeability very broadly, concluding that the rarity or severity of the disease that plaintiff contracted is not relevant in determining foreseeability. In the court's view, *any* illness from any insect bite is "harm of the same general nature" and is foreseeable, even if it is unprecedented. The risk occurred the moment an insect "latched onto [plaintiff's] arm and infected her"; according to the court, "that injury is the 'harm' or is the risk that the defendant should have foreseen . . . ."[9] The harm that she actually incurred,

_____

[9] The court relies on *Jaworski v. Kiernan,* 696 A.2d 332 (Conn. 1997), in which the foreseeability analysis focused on the risk of injury from contact playing soccer rather than on the knee injury the plaintiff suffered (MOD.20-21). But ACL injuries

a serious disease that no American traveler in China before her had contracted is, in the court's view, relevant only to the "measure of damages," not to liability. (MOD.19-20). But the relevant negligence inquiry *does* focus on harm; the test is whether "*harm* of the [same] general nature" was foreseeable. *Sic,* 54 A.3d at 558 (emphasis added). Insect bites occur every day. The actual "harm" here, the disease that Cara Munn got, was unprecedented, and harm of the same general nature, i.e., any similarly serious, insect-borne illness, was not foreseeable.

The court essentially conflates "harm of the same general nature" with any harm that flows from the same means of transmission (an insect bite) that could be prevented by the same means (insect repellent). By that theory, a rash from an insect bite is harm of the same general nature as a serious neurologic disease. It is not, and framing the inquiry that way inevitably leads to liability for unforeseeable harms. If a tour guide neglects to instruct a group to wear facemasks in a place like Chengdu, China with air pollution, it is foreseeable that some will have irritated upper respiratory passages as a result. It is not foreseeable that a fatal toxin – previously unknown to exist in Chengdu – would kill them, even though both could have been prevented by wearing a mask and even though, in the court's view, the foreseeable harm occurred the moment the tourists breathed polluted air without a mask.

_____

happen all the time in soccer. The parallel to contracting TBE in this case would be if a soccer player had a heart attack from playing soccer and the court still found foreseeability.

Broadening the foreseeability inquiry as the court has done will do little to reduce actual risk. A warning that insects can carry diseases and one should use insect repellent is likely to have little impact; students and parents know this already. A warning that they face an appreciable risk of contracting a serious insect-borne illness would surely have an impact – but Hotchkiss had no basis to issue such a warning. Moreover, if Hotchkiss must warn of *any* harm that can flow from an insect bite, it undoubtedly has to warn of other common risks that students face every day – a risk of being bitten by a dog, being hit by a car, getting food poisoning, and tripping on uneven pavement.

Based on reliable sources of information in the spring of 2007, the risk of contracting a serious insect-borne disease on the trip, i.e., harm of the general nature plaintiff incurred, was not foreseeable, and Hotchkiss should not be liable for that harm.

### Public Policy

Even if defendant reasonably could have known by consulting sources beyond CDC advisories that a serious insect-borne disease existed on Mt. Pan, public policy – an issue solely for the court – does not support imposing a duty on a school to engage in extraordinary efforts to seek out such information and warn against remote risks. "While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world." *Lombard v. Edward J. Peters,*

*Jr., P.C.*, 749 A.2d 630, 636 (Conn. 2000) (citation omitted).

To start, the court incorrectly construes Connecticut law to require a public policy analysis only if defendant should have foreseen the general nature of plaintiff's injuries (MOD.54-56). But *Lodge v. Arett Sales Corp.,* 717 A.2d 215 (Conn. 1998), actually says:

> We recognize, as we have in the past, that the issue of foreseeability cannot be neatly compartmentalized and considered wholly separate from the policy issues that are central to our legal determination of duty. We focus our decision, therefore, equally on the policy implications of this case rather than strictly upon the foreseeability of the plaintiffs' harm.

*Id.* 222 (citations omitted). In short, the public policy analysis is intertwined with the foreseeability analysis.[10]

Connecticut courts do not impose a duty "if doing so would be inconsistent with public policy," which is determined by weighing four factors: "(1) the normal expectations of the participants in the activity under review; (2) the public policy of

---

[10] The court also improperly criticizes the reasoning of the Connecticut Supreme Court:

> Although the Court cast its decision as based on public policy, its decisions in *Lodge* and *RK Constructors* [*Inc. v. Fusco Corp.,* 653 A.2d 153 (Conn. 1994),] are more properly understood as decisions regarding issues of attenuation and causation, not traditional public policy analyses.

(MOD.56). But *Lodge*, absolving an alarm company for not foreseeing that a fire truck racing to the scene of a false alarm would have brake failure even though brake failure on a heavy truck is not exactly a rare event, cannot be distinguished that way.

encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Monk v. Temple George Assoc., LLC*, 869 A.2d 179, 186-87 (Conn. 2005) (citation and quotation marks omitted). None of the factors support imposing a duty here.

First, in the absence of widespread publicity about medical problems in a region or knowledge of unusual susceptibility of a student to medical problems, reasonable participants in school-sponsored trips do not expect schools to warn or protect against serious illnesses no traveler has incurred that the government agency specifically responsible for evaluating such risks does not warn against. It is unreasonable to expect an organization to take precautions and sound an alarm against an illness when the CDC does not issue an advisory indicating a risk to travelers in the areas to be visited.

Second, study-abroad programs provide substantial public policy benefits, positively influencing students' career path, world-view, and self-confidence. Connecticut has recognized the merits of international school programs:

> It shall be the policy of the state to encourage its students, teachers, administrators and educational policy makers to participate in international studies, international exchange programs and other activities that advance cultural awareness and promote mutual understanding and respect for the citizens of other countries.

C.G.S. §10-27(a). The type of open-ended duty and foreseeability obligation

20

imposed by the court here will necessarily lead to a reduction in school-sponsored programs.

Third, imposing a duty on defendant would increase litigation, broadening the range of potential claims against schools under the failure-to-protect rubric. Shortly after the verdict here, a party sued a YMCA camp claiming $41,750,000 in damages, the precise amount of this verdict, for failing to protect a camper against Lyme disease. *Horowitz v. YMCA Camp Mohawk, Inc.*, 3:13-cv-01458-SRU (D.Conn. 2013).

The court dismisses these arguments as "a parade of horribles," noting that the burden is only to give students "gentle reminders" to bring and use bug spray (MOD.59). But the jury held that defendant failed "*to ensure* that Cara Munn used protective measures" (T.1560; emphasis added), undoubtedly based on plaintiff's expert Tarlow's testimony that defendant had a duty to warn and a duty to "make sure" students took precautions against insects, including wearing protective clothing, staying out of risky areas, checking themselves for ticks, and using DEET (T.450). Dr. Rose said essentially the same thing (T.703-04). If students or their parents object to using DEET, schools may not allow such students to go out at all. Making sure students inspect themselves for ticks raises concerns about compliance (do trip leaders take the student's word for it?) and privacy (must trip leaders do the inspection themselves?).

21

Even if the duty is limited to providing warnings, litigation will likely increase. The court itself inadvertently highlights this risk when it analogizes this case to a supposed duty to "remind student athletes to put in their mouth guards before they take the football field or advise them to apply sunblock before walking outside on a sunny day." (MOD.59; footnote omitted). If that is the upshot of this case, is there any question that litigation against schools will increase?

Similar situations can easily be imagined, such as warning students of the possibility of earthquakes on a trip to California or of street crime on a trip to any city. As with insect-borne diseases, if there is a governmental advisory or widespread publicity about a particular problem in a particular area or at a particular time – unrest in a country, an avian flu epidemic, a crime wave in a city, an outbreak of a food-borne disease in the region – the school should warn the students. But to expect schools, or any organization, to warn participants of dangers that are either obvious or not considered significant enough for the government to mention them in advisories would open a wide door for future litigation. Schools, to protect themselves, would have to engage in extensive investigation, bury students in paperwork, give oral reminders in the presence of witnesses, engage in oppressive supervision, and consider whether the advice is given in such a way that the student later cannot credibly deny receiving it.

Fourth, the paucity of reported cases in other jurisdictions shows that the

22

litigation door has up to now not been wide open. Courts declined to impose a duty on educators in the two reported cases reasonably analogous to this case. In *David v. City of New York*, 835 N.Y.S.2d 377, 379 (N.Y.App.Div. 2007), the court found that a child's eye injury, incurred on a hay ride, was not foreseeable because "prior field trips to the farm, which included hay rides, had passed without incident and that the school had no knowledge or notice that a hay ride would be hazardous to a child of the infant plaintiff's age or that there were any specific hazards on the wagon." In *Mancha v. Field Museum of Natural History*, 283 N.E.2d 899, 901-02 (Ill.App.Ct. 1972), the court held that the risk that a 12-year-old boy would be assaulted by an unaffiliated group of students during a field trip to the museum was "minimal" and did not support imposing a duty. Anyone who has ever gone on a hayride or been in a big city knows there is a remote possibility of such a serious mishap. Those are two of the unfortunate risks of living on this planet, and this case presents a third.

In the end, public policy weighs strongly against imposing a duty in this case. If schools must dive more deeply than the CDC has, then the parade is indeed one of horribles. It does not serve public policy to leave in place a judgment against a school because its student had the misfortune of contracting a serious insect-borne disease the school could not have foreseen. "To hold otherwise would be to convert the imperfect vision of reasonable foreseeability into the perfect vision of hindsight."

23

*Lodge,* 717 A.3d at 223 (citation and quotation marks omitted).

## II.    The Charge Directing the Jury to Consider the Gravity of the Harm in the Midst of the Charge of Foreseeability Misled the Jury.

Standard of Review:  De novo, but reversal only when charge, reviewed as a whole, demonstrates prejudicial error.  *U.S. v. Coppola,* 671 F.3d 220, 247 (2d Cir. 2012), cert. denied, 133 S.Ct. 843 (2013).

Even if defendant had a duty to protect plaintiff from a serious insect-borne disease like TBE, the charge on foreseeability – one of the most crucial issues before the jury – was misleading and confusing.  The court erroneously instructed the jury to consider "the gravity of a possible harm" as part of a charge to determine whether there was an appreciable risk to guard against.  That is not the law.

The entire charge on foreseeability is as follows:

> A defendant is not negligent unless he knew or reasonably should have known of a risk.  This is referred to as the "foreseeability" requirement.  The school can only be held responsible for failing to protect Cara against a risk that a reasonable school should have foreseen.  In this case you must determine whether the school should have foreseen the risk of insect borne disease.  This is not question of strict probability.  If the risk is an appreciable one, and the possible consequences are serious, the question is not one of mathematical probability alone.  *As the gravity of a possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution.*

> Note, it does not matter whether the school could have foreseen the extent or manner of Cara's injuries.  The law only requires that a defendant could have foreseen harm of the same general nature as Cara's injury.  In this case the plaintiff argue that any infection by insect-borne disease is harm of the same general nature as Cara's illness, while defendant counters that the school could not have foreseen that Cara would contract tick-borne

24

encephalitis or any other insect-borne disease.

(T.3/26, 1456-57; emphasis added).  The use of the italicized language in this context was misleading; in any event its use in this context is an issue meriting certification. Defendant objected to this sentence in the foreseeability charge (T.3/25, 1452-54).

Nothing else in the charge modified or clarified the relationship between foreseeability and possible harm.  It was therefore of the highest importance that the foreseeability paragraphs not confuse the jury, but the italicized sentence did just that.  It diverted their attention from the crucial point:  in all cases the risk must be an appreciable one; gravity of harm is unrelated to that issue.

The italicized sentence and the prior one are a direct quote from a footnote in *LePage v. Horne,* 809 A.2d 505, 515 n.16 (Conn. 2002), quoting Prosser's Treatise on Torts, but they are taken out of context.  The Connecticut Supreme Court has criticized quotations from its opinions as generally inappropriate for a charge to the jury.  *Film v. Downing & Perkins, Inc.,* 66 A.2d 613, 614 (Conn. 1949) (judgment reversed because of improper instruction); *Stedman v. O'Neil,* 72 A. 923, 925 (Conn. 1909) (request to charge properly rejected).

This case is an excellent example of why that court has said so.  *LePage* reversed a plaintiff's verdict in a SIDS case, not because of the charge, but because plaintiff did not submit expert testimony showing that the risk of an infant sleeping prone is "appreciably greater" than the risk of sleeping nonprone. *LePage,* 809 A.2d

at 514-15. The footnote, which has not been cited since, begins by noting that it is talking about the "general issue of negligence," and continues by noting that the seriousness of the consequences is only relevant "if the risk is an appreciable one." *Id.* at 515 n.16 (citation omitted). The footnote then appears to state that, if the prone position doubles the risk over the nonprone position from one to two in a million, the risk would still *not* be an appreciable one even though the consequence is by definition the gravest possible harm, death.

As the Connecticut Supreme Court recently held, despite "a general duty of reasonable care," the "ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised." *Sic,* 54 A.3d at 557-58. That, and not the dictum in the *LePage* footnote, is controlling. Connecticut law on duty thus requires a two-step inquiry – first to determine the existence of a duty (based on foreseeability) and then to determine the scope of the duty. *Id.* However, defendant never argued that, had the risk of a serious disease like TBE been foreseeable thereby establishing the existence of a duty, the scope of duty to take precautions would have been unaffected by the gravity of the harm. The *Prosser* quote was therefore misleading, placed as it was in the midst of instructions for determining *foreseeability*, when that language had no relevance to the jury's consideration of that subject.

In short, the problem with the challenged sentence in the charge is that the sentence suggests the risk need not be an appreciable one. The jury could easily have been confused and misled to understand that, given the serious injury to plaintiff, defendant had a duty to protect students from one- or two-in-a-million chances even though students and everyone else routinely and reasonably take such chances every day when they walk across a busy street.

The court seeks to justify the charge by referring to the "notion that people will get out of the water in a lightning storm" because of the grave consequences of electrocution, even if the odds of injury are low. (MOD.30). But there the risk is appreciable, not because of the possible *gravity of electrocution,* but rather because of the *presence of the storm. Prosser* would therefore impose a duty of precaution to bring the boat to shore when the low (yet appreciable) risk could be deadly. But the present case is more akin to a lightning strike on a boat out of a clear blue sky. The potential gravity of that harm, in the absence of appreciable risk, has no relevance to foreseeability.

Finally, the context of the sentence increases the risk of confusion. It would not be readily apparent to a juror that the phrase "if the risk is an appreciable one" in the previous sentence applies to the final sentence. A reasonable juror could easily misunderstand the italicized sentence as meant, not to explain the previous one, but to apply if the risk is *not* an appreciable one.

27

Jurors should not be permitted to find remote possibilities foreseeable, even if the possible harm is death. *Sic* said it was unforeseeable that a stopped defendant waiting to make a left turn with his front wheels facing left could be rear-ended, even though rear-end collisions happen every day and the consequence in that case could be devastating. And *Lodge* absolved the alarm company for not foreseeing a fire truck's brake failure even though brake failure occasionally occurs and the consequence of a speeding fire truck colliding with an automobile can easily be imagined.

The charge on foreseeability misled the jurors on a critical issue; it was harmful error, requiring a new trial.

### III. The Court Erroneously and Prejudicially Struck Defendant's Expert's Entire Testimony on Standard of Care, While Permitting Plaintiff's Unqualified Experts to Testify.

Standard of Review: Abuse of discretion. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002).

Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993). This obligation applies to all expert testimony, not merely scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). An expert must be qualified "by knowledge, skill, experience, training, or education" to offer

28

admissible testimony. Fed. R. Evid. 702. The admissibility inquiry focuses "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Where the expert's "factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho*, 526 U.S. at 149 (citation and quotation marks omitted).

The court abused its discretion in applying these principles. In a ruling deeply prejudicial to defendant's ability to present its defense, the court struck the testimony of William Fluharty, defendant's sole expert witness on the standard of care that secondary schools providing study-abroad programs owe their students. Fluharty had operated a study-abroad program at his school, researched the approaches that leading schools take, and personally led a trip to China. But the court excluded him – after he had already testified at length – because it thought he "did not testify truthfully" and because his testimony "was not based on sufficient facts or data." (MOD.73). Compounding that error, the court permitted plaintiff's experts, Peter Tarlow and Stuart Rose, to testify on this issue, applying far more lenient standards in addressing their lack of qualifications, the basis for their opinions, and the permissible scope of their testimony.

    A.    *Plaintiff's Experts Were Not Qualified to Opine on the Standard of Care.*

29

Peter Tarlow was plaintiff's principal expert witness on the standard of care applicable to defendant. The court acknowledges that Tarlow had no prior experience with China and "did not testify about the risks of travel in China" and that he "assumed that the risk of insect-borne disease was foreseeable and then opined about the proper precautions schools should take to protect students." (MOD.60). According to Tarlow, defendant had a duty "at the bottom of Mt. Pan, and while on the Mt. Panshan hike, to make sure that Cara Munn took insect-bite precautions, including using DEET, wearing proper clothing, staying out of risky areas, and checking herself for ticks." (T.450).

Tarlow conceded he "never studied a secondary school's responsibility to the students at all," admitting that "No, that's not my area of expertise" (T.456) and that he never assessed risk or provided advice on minors (T.441). While he had experience in tourism risk management, this experience entailed work on security issues, not disease protection. He explained that his "specialty is tourism and crime safety" in the tourism industry.[11] (T.429). His education consisted of degrees in

---

[11] Although the court points to this experience as part of the reason it qualified Tarlow as an expert (MOD.60), it repeatedly challenged the qualifications of defendant's expert William Fluharty (who actually led high school trips abroad and ran an organization that issued study-abroad standards) for not focusing on his experience concerning the standard of care for insect-borne disease (T.1308-09, 1318-24, 1333, 1341-42).

Spanish literature, political science, sociology, and a rabbinical degree (T.428-29).

Voir dire revealed he had taken abroad only one high school group, which included

his son, on a trip to Israel and had led three college groups on trips to Ecuador, Peru,

and Mexico (T.435-36). He indicated, however, that his lack of experience leading

high school groups did not change his opinion (T.471).

Tarlow searched both the internet and his university library for scholarly

literature addressing the standard of care, but he did not indicate what, if anything,

he found (T.431). In addition to talking with colleagues (whose background he did

not give), he posted the following query on Tripatini:[12]  "I am seeking to learn if

anyone knows of health standards of care, other than telling them to buy insurance,

for students traveling abroad."  (T.462-63).  He did not say who, if anyone,

responded, or what background the respondents had, but he indicated that no one

responded "by saying the standard required the leaders to compel the use by the

traveler of insect repellent." (T.463).  Notably, Tarlow also admitted he did not "talk

to anyone who actually works in a secondary school travel program." (*Id.*).

Defendant objected to Tarlow's qualifications before trial and at the start of

his testimony pursuant to *Daubert* (T.3-5, 425).  Nevertheless, the court allowed his

---

[12] Tripatini's home page describes the site as "the world's smartest travel social
network." www.tripatini.com (last visited 10/7/14).  Tarlow described it as a social
networking site for the travel industry (T.462).

testimony because Tarlow reviewed mandated safety standards for adults and assumed that such standards set the minimum for secondary students (*id.*). The court further notes Tarlow had discovered "government documents and manuals from educational institutions"[13] concerning insect precautions and "assumed that those recommendations would be mandated for students" (MOD.61), although Tarlow admitted none of these documents said that secondary school travel-abroad programs must compel the use of insect protection at any particular time (T.466-67).

Tarlow was plainly unqualified to testify as to what secondary schools should do. None of his degrees had anything to do with a school's duty when traveling abroad, and he had no prior experience with the standard of care applicable to secondary schools. Normally, the expert knows what the standard of care is and researches the applicability of the standard to a particular case. Here, however, Tarlow had to research the standard of care itself for purposes of testifying in this case. While courts typically give little or no consideration to "expertise [that] was developed for litigation," *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (citation omitted), the court here disregarded that principle, stating that "Tarlow did what any expert would: he developed a hypothesis, researched the question and arrived at a sensible conclusion." (MOD.61). This hardly constitutes expertise that

---

[13] The only materials from a United States secondary school were from Clark County, Nevada; he also mentioned seeing materials from schools in England, Yukon, and Australia (T.459-60).

"naturally flowed from the expert's research." *Polski*, 538 F.3d at 839 (citation omitted). *Cf. Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 692 (2001) (expertise developed independently of litigation "is less likely to be biased"). Indeed, at least some of this research came from plaintiff's counsel (T.431).

Given Tarlow's lack of experience advising secondary schools on protecting students traveling abroad, and the lack of reliable data upon which to form a reliable opinion,[14] his testimony amounted to nothing more than an ipse dixit. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Speculation is an insufficient basis on which to admit expert testimony. *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). Tarlow's testimony is nothing more than sheer speculation that the strategies appropriate for adults are effective in supervising teenagers.

The court attempts to minimize its error by characterizing it as harmless given that defendant urges insect protection "in other contexts . . . where the school knows of a risk." (MOD.61-62). But, as discussed in Issue I, there is no basis for the

---

[14] A social networking site can be an appropriate venue to gather information if the contributors have the expertise to provide reliable data. Here there was no information about the credentials of the respondents, if any, to Tarlow's query on Tripatini other than Tarlow's general statement that the site was for those who study or are professionally involved in travel (T.462). There is no evidence, for example, that any of the Tripatini users operated travel-abroad programs for secondary schools. Contrary to the court's criticisms of defense's position (MOD.61), it is not that Tarlow did an internet search to acquire data, it is that he failed to demonstrate that the data he obtained were reliable.

33

defendant to foresee a risk of a serious insect-borne disease. Even Tarlow admitted that when he took students to Mexico, he did not insist they use insect protection because there was no foreseeable risk of such disease (T.455). The same was true here.

Moreover, Tarlow took the extreme position that defendant had a duty to *compel* insect protection (T.450), not just, as the court says, to give "a quick, gentle reminder" to use it before hiking (MOD.59). The trip leader testified that she asked students to bring insect protection every time they went out (T.575-76). But Tarlow imposed a higher standard. He should not have been allowed to testify.

Like Tarlow, Dr. Rose had no experience in the standard of care applicable to secondary schools, but unlike Tarlow he offered no testimony that he even investigated such standard. In short, if Tarlow was unqualified, a fortiori Rose was unqualified. Defendant objected to Rose's qualifications on the standard of care (T.626, 632-36).

Rose testified that a "competent practitioner of travel medicine should have advised against the risk of tick-borne encephalitis." (T.681). The central issue, however, is not whether a travel medicine doctor should foresee the risk of a serious insect-borne disease, but whether a secondary school should. *See DiPietro*, 49 A.3d at 959 (opinion of biomechanics expert with no expertise in indoor soccer arenas that playing surfaces should be scientifically tested provided no basis for duty in

34

arena operator to know of defect in playing surface).

Whatever his other qualifications, Rose was not qualified to testify on standard of care here.

B.    *William Fluharty Was Qualified and Did Not Mislead the Jury.*

The leniency the court showed in permitting plaintiff's experts to testify stands in sharp contrast to its treatment of defendant's sole expert witness on the standard of care a secondary school owes for study-abroad programs.

Unlike plaintiff's experts, William Fluharty had actual experience with secondary schools.  Since 2003, he has been the Director of Global Studies at the Cape Henry School, overseeing the school's "global education programs." (T.1283). In this capacity, he has overseen trips to "over 35 different countries," averaging "six to eight programs" per year (T.1284-85).  Fluharty personally supervises "at least two, sometimes three, different groups abroad every year." (T.1285).  He is also Director Emeritus of the Global Education Benchmark Group (GEBG), a consortium of 85 independent schools that focuses on global studies and international travel. GEBG "measure[s] the common practices" for global travel of similarly situated, secondary-educational institutions." (*Id.*).

Although the court qualified Fluharty over plaintiff's objection (T.1287), the court subsequently struck his testimony before cross-examination began (T.1366). The court explains it "struck Fluharty because he lacked a sufficient basis in facts or

35

data for his proffered expert testimony and, lacking such a basis, he fabricated the supposed support for his opinion testimony and misrepresented his personal, lay opinions as reliable expert opinions." (MOD.67). The transcript of his testimony does not support either of those reasons.

While untroubled by Tarlow's reliance on conversations with unidentified colleagues on an online message board, the court criticizes Fluharty for relying on "anecdotal conversations with only a handful of schools." (MOD.68). It is perfectly proper for an expert to rely both on his own experience *operating such programs* and on colleagues, who also *operate such programs*. *See, e.g., First Union Nat'l Bank v. Benham*, 423 F.3d 855, 862-63 (8th Cir. 2005) (expert testimony erroneously excluded because it was based on attorney's own experience rather than the experience of other lawyers); *Rodriguez v. Board of Education,* 480 NYS.2d 901, 902-03 (N.Y.App.Div. 1984) (expert's 36 years of experience in special education provided basis for testimony that purposeless running was hazardous to children with special needs); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (expert's extensive practical experience qualified him to testify whether plaintiff was in breathing zone of glue flames). Moreover, the specific schools he consulted operated "blue ribbon programs" in global studies as identified by the National Association of Independent Schools (NAIS), which had designated them as models for other global programs (T.1288).

36

When plaintiff's counsel objected that conversations with officials at these blue-ribbon study abroad programs were not a proper basis to establish an industry standard, the court responded: "Well, I'm going to allow it. I think these points can be brought out on cross." (T.1317).[15] That initial ruling was correct, and the court should not have retreated from it by striking his testimony in part on the ground that it was not well-substantiated. *Amorgianos*, 303 F.3d at 267 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citation and quotation marks omitted).

The other basis for striking Fluharty's testimony – that "he did not testify truthfully" – misapprehends the testimony concerning surveys Fluharty conducted in 2008 and 2012, as the full transcript of his testimony shows (T.1282-1352). The court finds that the 2012 "survey results directly contradicted Fluharty's sworn statements about the basis of his testimony." (MOD.72).

First, Fluharty's testimony was based in part on the 2008 survey but also on his discussions with colleagues at other schools with leading study-abroad programs and his own experience actually running those programs (T.1288-91) – a proper and

_____

[15] Notably, this ruling came *after* Fluharty testified about both his 2010 trip to China and his consultation with at least one other school, both points the court erroneously relies on in its Rule 59 post-judgment ruling to justify striking the testimony (MOD.68-70). As the court correctly recognized in the first instance, any complaints about the strength of his data were properly the subject of cross-examination.

sufficient basis for his testimony. When he referenced a 2008 GEBG survey on study-abroad programs, the court called a recess and asked him to find the survey on-line using a judicial law clerk's computer (T.1348-49). Fluharty was only able to retrieve the 2012 GEBG survey (T.1350). The court relied on the absence of data on insect-borne illness in the 2012 survey to strike all of Fluharty's testimony as untruthful (T.1358, 1359-60). The court states that Fluharty assured the court that the two surveys asked "substantially similar questions" (MOD.72 n.33), but Fluharty actually testified that the 2012 survey was shorter, having been edited down, and the 2008 survey was not available to compare (T.1351).

Nothing in the exhibits and transcript pages referenced by the court supports its finding that Fluharty's testimony was untruthful and had to be struck (MOD.72; citing T.1299, 1333, 1335, 1339, 1342-48, Ct. Exs. 1 & 2). Pages 1298-99 merely refer to discussions with colleagues. On page 1333, the court inquired whether the survey asked about TBE, and Fluharty responded, "No. But what we do as part of the survey is, we actually gauge common practices based on insect prevention, what do you do and how do you gauge it." Fluharty further stated no one had a common practice for TBE because "it was such a remote possibility." (T.1333). He explained a bit later: "Amongst the many questions we asked, we asked, what is the primary source of health-risk information, so where do schools go when they are assessing the potential risk of health in a destination." (T.1335).

38

Later, Fluharty clarified the scope of the 2008 survey by responding "No" to whether "[i]n connection with the survey that you did for the GEBG, did you ask questions about precautions taken against insect-borne diseases prior to 2008?" The survey did ask questions about chaperones (T.1342-44). He also explained that in his work with NAIS, he gauged schools' "top resources for health assessment" and that the GEBG survey inquired into common practices for pre-travel health visits (T.1345, 1347).

As for the exhibits, the 2012 survey had three pie charts showing the percentage of responses to the questions "Who advises students and adults on health concerns abroad?", "Are students required to meet with a travel medicine specialist or a doctor prior to travel abroad?" and "Are the CDC recommended vaccines mandatory for students to participate on a travel program?" (Court Ex.2; T.1353). This is consistent with Fluharty's testimony.

To the extent Fluharty's earlier statement that the surveys involved gauging insect-prevention (T.1333) implied that the surveys specifically asked this question, he clarified shortly afterwards that this was not the case (T.1335). Any inconsistency or confusion in this testimony was the proper subject of cross-examination. *Amorgianos*, 303 F.3d at 267. It is not evidence he was lying. As the court later charged the jury, weighing the credibility of the expert witnesses was their role (T.3/26, 1473-74); Fluharty's testimony should not have been stricken.

39

Striking Fluharty's testimony was devastating to the defense. Without him, defendant had no expert on the standard of care. Plaintiff's counsel took full advantage of this ruling in his final argument to the jury:

> There was no standard of care expert offered by the defendant, so Mr. Tarlow's testimony on that point is unrefuted. There is no alternate testimony from an expert in the case about what the school's duty was under the standard of care at the time. Everything Mr. Fluharty said was stricken.

(T.1486).

Once the jury had two expert witnesses for plaintiff on standard of care and none for defendant, the result was foreordained. The expert witness rulings were harmful error, requiring a new trial.

### IV.  The Jury Could Not Conclude, Without Speculating, that Plaintiff Proved She was Infected With TBE on Mt. Pan.

Standard of Review:  Rule 50, De novo; *Stampf*, 761 F.3d at 197; Rule 59, abuse of discretion, *ING Global*, 757 F.3d at 97.

For presumably good reasons, albeit known only to plaintiff, she chose to stake her case on proving she was infected with TBE specifically *on Mt. Pan* (T.1451, 1499-1500, 1560-62),[16] and thus the jury was required so to find. The jury interrogatory specifically asked whether plaintiff proved that she "was infected by an insect-borne disease while visiting Mt. Pan?" (DN.193).  The jury could not have

---

[16] Plaintiff attempted to expand the claim beyond Mt. Pan at the charge conference, but the court properly limited the charge to Mt. Pan, consistent with the evidence at trial (T.3/25, 1441-43, 1470-76).

40

answered "yes" to that question without speculation. While the evidence showed that plaintiff had insect bites from Mt. Pan, it also showed that she had gotten insect bites before her visit to Mt. Pan, that the places she visited before Mt. Pan were suitable habitats for ticks, and that the timing of those visits placed them well within the incubation period for TBE. Even plaintiff's medical expert could not rule out those alternative locations as the sources of infection, requiring the jury to speculate in responding to the critical interrogatory. The Connecticut cases support defendant's position that plaintiff did not prove causation.

Plaintiff testified that she got bug bites on her left arm on Mt. Pan, they began to itch right after she got off the mountain, one got red and raised and about two to three inches in diameter, and that she would not know if she had a tick on her (T.1034-37). She also testified that, other than at the high school and restaurants she visited, it was *buggy everywhere else,* and at no point did she use insect repellent on the trip (T.1034). In response to the question "Is the only time that you recall getting bitten when you were on the path on your three to four hour trek down Mt. Pan?" she answered, "No, I believe in my testimony I said that *I had bites on my legs as well before Mt. Pan."* (*Id.*; emphasis added). She appears to have worn shorts and short-sleeve shirts throughout the trip (T.811).

41

Plaintiff developed symptoms on July 3, which was 10 days after the June 23 hike on Mt. Pan (MOD.4-5); symptoms normally show up 7 to 14 days after being bitten (MOD.33), although it could be 4 to 28 days (Ex.591; T.727).

As Rose admitted, ticks are found in a wide variety of areas: "forest fringes with adjacent grassland, forest glades, riverside meadows and marshland, forest plantations with brushwood and shrubbery" and "most commonly on ground-level vegetation on the underside of foliage" (T.671-72); he also admitted one can get ticks in "your backyard" and "in grass" (T.728). The China trip started on June 10; on June 18 and June 19 plaintiff went to football matches; on June 21 she went to Nankai High School/University; and on June 23, the day of the Mt. Pan trip, she also went to the Great Wall of Tianjin, Dule Temple, Long Life Garden, and Shiqu Garden (Ex.11; T.574-82). Students and chaperones complained about insect bites while at Nankai (MOD.33). Most telling, Rose admitted he did not have enough information about any of the other places the students went in China, such as whether they had grassy areas or greenery, to rule out other places she may have been bitten (T.728-30).

When asked his opinion on why plaintiff was infected on Mt. Pan, Rose stated:

> Well, she was in a rural area, she was wearing light clothing, she was walking in wooded areas where she was in contact with bushes and brushes, the sort of vegetation that harbor ticks. She mentioned that she had itchy bites, had sustained itchy bites during her descent of Mt. Pan. She did not use DEET. And she developed symptoms 10 days later, which is exactly what one would expect for the incubation period of tick-borne encephalitis.

(T.698-99). Rose did *not* mention the red welt.

Plaintiff's counsel then asked Rose to make the following assumption:

> Assume there were no other locations on the trip where there was brushy forested areas where the school brought the children. Assume that Cara, at the end of the hike on Mt. Pan, had a red welt on her arm *and other insect bites that she was complaining about on her legs.*

(T.702; emphasis added). Rose's answer that she was infected on Mt. Pan (T.703-04) did not distinguish between the red welt on her arm and the leg bites, or when she got them.

The evidence plaintiff was infected on Mt. Pan is speculative. She testified that she was bitten on her arm on Mt. Pan but also that she was bitten on her legs before Mt. Pan. One would have expected Rose to point to the Mt. Pan bite on her left arm where she had a red welt as the probable site of the infection. But he did not. In his testimony Rose talked about everything *except* the red welt. And in answering the hypothetical question, he failed to distinguish either between the red welt on her arm and the leg bites or between Mt. Pan and the other places plaintiff visited about which Rose had insufficient information. Plaintiff chose to limit her case to a claim that she was infected while on Mt. Pan. Having done so, she had to prove she was infected there.

The jury could not know from its own experience the significance of the red welt as opposed to the other bites suffered prior to the Mt. Pan visit. (For example,

whether tick bites, as opposed to other bites, produce red welts, what size they reach, and whether there is a delay of several hours or even days before they are noticeable.) See *LePage*, 809 A.2d at 514-15 (judgment directed for defendant where jury could not know whether infant should or should not be placed prone without expert testimony). Without specific evidence showing a bite on Mt. Pan as the source of the infection, the jury could only speculate as to when and where she became infected.

In *Paige v. St. Andrew's Roman Catholic Church Corp.*, 734 A.2d 85, 90-91 (Conn. 1999), and *Gurguis v. Frankel*, 888 A.2d 1083, 1088, *cert. denied,* 895 A.2d 789 (Conn. 2006), the circumstantial evidence did not "rest upon some basis of definite facts" and so judgment was directed for defendant. *Paige* is especially relevant. The boiler that injured plaintiff, as well as the activation switches, were located in the basement of defendant's building. While one of defendant's employees certainly *could* have activated the boiler while plaintiff was inside it, the opportunity for an employee to do so was not sufficient to prove without speculation that an employee, rather than, say, a parishioner, in fact *did* so. One might think it reasonable to assume an employee probably activated the burner, but *Paige* said otherwise.[17] The record here is equally speculative.

---

[17] The court points to a supposed ambiguity in the *Paige* verdict (MOD.38). *Paige* says nothing at all about an ambiguity; the jury finding exonerating one employee

While defendant clearly put plaintiff on notice in its motion for summary judgment that her causation evidence was insufficient (DN.115), the court holds that defendant "almost certainly" waived that argument for Rule 50 purposes on the ground that it did not raise causation in its Rule 50(a) motion (MOD.33). But defense counsel did again raise the issue there, when she said "*or further*, that any conduct . . . [interruption] *contributed to* the claimed injury" (T.1200-01; emphasis added). Furthermore, this was clearly an issue throughout the trial.

The court's post-judgment decision never refers to this language (MOD.34-36). If there is ambiguity about what issue defendant is raising, it is the opponent's duty to object at the Rule 50(a) proceeding. *Marfia v. T.C. Ziraat Bankesi*, 147 F.3d 83, 87 (2d Cir. 1998); *Altamuro v. County of Nassau,* 33 F.App'x. 556, 560 (2d Cir. 2002); *Myklatun v. Flotek Industries, Inc.*, 734 F.3d 1230, 1234 (10th Cir. 2013) (quoting *Marfia*). Plaintiff did not do so and therefore has waived her waiver argument. In any event, causation is before this Court under Rule 50(b) to prevent the manifest injustice of a verdict lacking a basis to find causation and also on review of the denial of defendant's Rule 59 motion.

Like the plaintiffs in *Paige* and *Gurguis*, plaintiff here failed to offer evidence that would allow a jury to conclude, without speculation, that a bite that occurred on

---

simply limited plaintiff's case to whether the culprit was any other employee, on which the evidence was insufficient. *Paige*, 734 A.2d at 92-93.

Mt. Pan was the tick bite that gave her TBE. If the tick bite actually occurred there, it would have been so easy for plaintiff to prove it through Rose. The court says a tick "latched *onto her arm* and infected her." (MOD.19; emphasis added). But on this record, there was simply no proof of that. When and where she was infected is all speculation. The judgment should be reversed, with judgment directed for the defendant.

### V. The "Release of Claims" Unambiguously Released Defendant from Liability, and the Release Is Not Against Connecticut Public Policy.

Standard of Review: Pure issue of state law; review is plenary. *Israel v. State Farm Mut. Auto. Ins. Co.*, 293 F.3d 595, 600 (2d Cir. 2002).

Plaintiff and her mother signed a "Release of Claims" on March 7, 2007 concerning the trip. It states:

### 7. Release of Claims

In consideration of the School accepting the Student into the Program, the Student . . . and the Student's parents . . . hereby release and discharge the School . . . from:

- any and all claims that may arise from any cause whatsoever, whether resulting from acts or omissions of any persons, from the operation or condition of facilities or premises, from acts of war or terrorism, or from acts of God or nature, or risks associated with the consumption of alcoholic beverages, use of illegal drugs in any form or injury or death from causes such as traffic accidents, crime, assault and theft;

- responsibility for any accident, illness, injury, or any other damage or consequence arising or resulting directly or indirectly from the Student's participation in the Program;

46

- any liability, damage, or injury that may be caused by Student's negligence or willful acts committed prior to, during or after participation in the Program; and

- any liability, damage or injury caused by the intentional or negligent acts or omissions of any other participant in the Program, or caused by any other person;

except to the extent that the liability, damage, injury, loss, accident, or illness is caused by the sole negligence or willful misconduct of the School, its officers, trustees, faculty, employees, agents or representatives.

(Release).

Before trial, plaintiff moved in limine to exclude the Release. During the trial but before plaintiff and her parents testified, the court ruled the release was invalid under Connecticut law because it is ambiguous and against public policy (DN.177). The court ruled incorrectly on three questions, which in any event are appropriate for certification.

The first question is whether the document is ambiguous in releasing defendant from liability for its non-sole negligence. If the Release is ambiguous or misleading, it is invalid. *Hyson v. White Water Mountain Resorts of Conn. Inc.*, 829 A.2d 827, 831-32 (Conn. 2003) (snowtubing release ambiguous); *Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 739-41 (Conn. 2005) (snowtubing release not ambiguous).

While the majority opinion in *Hyson* states that a release must expressly release the defendant from liability for its negligence, 829 A.2d at 831, that language

47

is dictum because the majority explains why the release was actually ambiguous as well as misleading. *Id.* at 828, 831. Likewise, the release in *Hanks* did expressly release the defendant, so *Hanks* had no need to reexamine the validity of the *Hyson* dictum. The court will "conduct [its] own analysis" when a prior ruling is dictum. *Rodriguez v. Testa*, 993 A.2d 955, 964 n.14 (Conn. 2010). That two justices felt even the poorly drafted language of *Hyson* was clear enough to release the defendant of liability suggests that this is a close question of Connecticut law.

The *Hyson* release is misleading in three major ways this Release is not: The former has a lengthy recitation of risks having nothing to do with anyone's negligence; it has only a "hold harmless and indemnify" clause, which turned into an exculpatory one because the injured party was the signatory; and it mentions plaintiff's responsibility but not defendant's.

The present Release, by contrast, mentions the release and discharge of defendant in the first paragraph, mentions types of incidents that are normally related to negligence in the first bullet, refers specifically to defendant's responsibility in the second bullet, uses the word "negligent" or "negligence" in the third and fourth bullets, and concludes by expressly retaining defendant's liability for its "sole negligence or willful misconduct" or that of its agents.

During the oral argument at trial concerning the validity of the Release, plaintiff stressed public policy and a probate issue, and the court remarked, "But it's

48

not like the waiver is unclear." (T.201). Plaintiff and her mother clearly understood that they were releasing defendant from liability for its negligence. The Release is not ambiguous.

The second open question is the breadth of the *Hanks* public policy ruling. It did *not* say all releases are against public policy, and there are significant distinctions between *Hanks* and this case.

First, this was a school-led trip, not a commercial recreational operation like the snowtubing facility in *Hanks* that the public could patronize. *Hanks*'s "repeated references to recreational operators suggest that the decision is limited to that context." *Omni v. Sonitrol Corp.*, 476 F.Supp.2d 125, 129 (D.Conn. 2007).

Second, it was a trip to a foreign country, with inherent and unknown risks and circumstances beyond the control of defendant as opposed to the routine, day-to-day operation of a recreational facility.

Third, the release did not completely absolve defendant of liability for negligence.

Fourth, , if the waiver is invalidated, school travel opportunities will likely be discouraged, contrary to the public policy stated in C.G.S. §10-27(a). There is no similar public policy promoting snowtubing.

Finally, and most important, defendant provided the standard school waiver and release form to parents and students months in advance of the trip to provide

49

ample time for them to weigh the benefits and risks, unlike snowtubing, where a customer is presented with a release immediately before snowtubing.

*Hanks* is the latest Connecticut appellate case concerning releases of liability for negligence. It was a 4-3 decision in which the majority acknowledged it was adopting the minority view. If this Release is also against public policy, it is unclear what release would survive. Yet the lengthy discussion of the circumstances in *Hanks* would have been unnecessary unless the majority contemplated releases that would survive. This is such a release.

The third open question is whether *Crotta v. Home Depot, Inc.*, 732 A.2d 767, 774 (Conn. 1999), bars evidence of the parents' negligence on the ground of parental immunity (MOD.44-45). This is relevant because the Release here excluded from its scope any injury from defendant's "sole negligence". The child in *Crotta* sued Home Depot, which sued the child's father for apportionment, contribution or indemnification. *Crotta* held the father immune.

No appellate case has applied the reasoning of *Crotta* where the parents are not being sued. The court cites state trial court decisions (MOD.45) relying on *Crotta* to bar parental negligence as a special defense to the child's action brought *by* the parent. But *Crotta* says nothing about such defenses, which do not concern immunity. In any event, those cases are inapplicable because parental immunity is

waivable. 67A C.J.S. Parent and Child §337. If the Release is valid, plaintiff and her mother waived immunity by signing it.

The court concludes that defendant did not preserve the release issue because it failed to attempt to introduce evidence concerning the parents' negligence (MOD.46-48). There are two responses. First, the school suggested the parents seek advice concerning the China trip from their own medical advisor but they did not do so (T.236-37, 965-66). Second, once the Release was invalidated, defendant should not have been expected to proffer evidence about how all possible aspects of the release issue (e.g., sole negligence, full disclosure, duress) would have been tried if it were still in the case.

The Release was valid and should have been before the jury on the issue of the defendant's sole negligence.

## VI.    The $31,500,000 Noneconomic Award Is Excessive.

Standard of Review: Abuse of discretion. *Stampf*, 761 F.3d at 204.

The noneconomic damages award is one of the highest ever in Connecticut, warranted only if plaintiff's injuries were among the worst ever in Connecticut jurisprudence. Without minimizing the harm to plaintiff, the evidence does not come close to supporting that conclusion, and the verdict therefore shocks the conscience. In any event, the question of the criteria governing the excessiveness of the verdict is appropriate for certification.

51

The court's picture of plaintiff's life is belied by her accomplishments since 2007. Plaintiff returned to Hotchkiss in early 2008. After completing that semester, she switched schools to Convent of the Sacred Heart, from which she graduated three years later. In the summer of 2011, she volunteered for a week at Southampton Hospital. She had a paid summer internship at What to Wear Where in 2012. She did additional blogging for them in December 2012 (T.981-83).

At trial, she was a sophomore at Trinity College in Hartford, where she had friends she knew from her high school (T.986, 1100-01). She had a 2.92 average carrying a full courseload (T.981, 1040). She got extra time for tests, used her computer for notes and sometimes got notes from the teachers (T.1040-41). She had no other accommodations, nor did she have tutors; her post-illness grades were comparable to her pre-illness grades (T.1040-41, 1161).

Plaintiff socialized with her friends a couple nights a week and on weekends (T.1102). She was an English major and was a staff writer for the college newspaper (T.941, 982). She took pleasure in her writing and enjoyed fashion (T.941).

She skied and played intermediate tennis, though neither at the level she would like them to be (T.940, 1140-41). She obtained a driver's license and rode a bicycle (T.985-86). She had no assistance to get around the Trinity campus, nor did she need daily aids (T.1139-40).

52

Plaintiff enjoys traveling. She traveled with her family to Mexico. She traveled to Australia for a summer program, staying with a family there for two weeks; she traveled to Los Angeles for that trip with her parents but went the rest of the way with an escort from the airline (T.980-84, 1040).

Plaintiff's mother detailed her perception of plaintiff's difficulties, focusing on her speech impediment. Her mother testified that she was 100% cognitively (T.936). Most of her mother's concerns were with other people's perceptions of plaintiff and the future effect of those perceptions (T.933-41). But plaintiff is optimistic and independent and perseveres in the face of difficulty (T.924, 1070).

In short, plaintiff can travel, study, play and work.

The excessiveness of the verdict is governed by Connecticut law. *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 426-31 (1996). In *Buckman v. People Express, Inc.*, 530 A.2d 596 (Conn. 1987), the court found that a $50,000 emotional distress verdict "is so grossly excessive as to shock the conscience of this court; it is impermissibly beyond the limits of legitimate generosity." *Id.* at 602. Because, in making a remittitur, the Connecticut rule requires the court to set a fair appraisal of damages rather than the limit of legitimate generosity, *id.*, the court ordered a new trial unless plaintiff remitted $35,000 of the $50,000 verdict. *Id.*

Few appellate cases since *Buckman* have applied the excessiveness test to noneconomic damages, and none of the magnitude here. The three largest

noneconomic damages verdicts reviewed on appeal for excessiveness are *Champagne v. Raybestos-Manhattan, Inc.*, 562 A.2d 1100, 1124-25 (Conn. 1989) ($320,000 for seven-year loss of consortium, excessive); *Bhatia v. Debek*, 948 A.2d 1009, 1024-25 (Conn. 2008) ($2,500,000 for emotional distress after arrest on a false accusation of sexually assaulting one's own child and having the child brainwashed into believing it, not excessive); and *Saleh v. Ribeiro Trucking, LLC*, 32 A.3d 318 (Conn. 2011) ($687,868 noneconomic damages for permanent injury to the neck, shoulder and back, not excessive).

The Connecticut Supreme Court has not yet established specific criteria for the excessiveness analysis, as the trial court notes in contrasting the emerging federal jurisprudence on evaluating the punitive damages awards for excessiveness (MOD.81). Lacking even remotely comparable Connecticut appellate verdicts, the court relies on one decision involving New York law from this Court and three cases involving Connecticut law, only one of which resulted in a trial court decision (MOD.81-82).

In *Saladino v. American Airlines*, 500 F.App'x. 69, 75 (2d Cir. 2012), this Court upheld the denial of a remittitur to a quadriplegic man awarded $15,000,000 ($5,000,000 for past, and $10,000,000 for future, pain and suffering) in noneconomic damages. Plaintiff "has feeling only above his collar bone and at the top of his shoulders, and was able to move his shoulders and biceps. He cannot open

54

or close his fingers, has no movement in his wrists, and operates his electric wheelchair by leaning on a joystick." *Saladino v. Stewart & Stevenson Servs., Inc.*, 2011 WL 284476, at *3 (E.D.N.Y. 2011). He requires 24-hour care, is incontinent and cannot regulate his own temperature, just to name a few of his limitations. *Id.* at *4-5. "He is essentially a prisoner in his own body, dependant on others for every moment of his day, including the performance of his most basic bodily functions." *Id.* at *8.

In *Pouliot v. Paul Arpin Van Lines, Inc.*, 235 F.R.D. 537, 550-51 (D.Conn. 2006), the trial court denied a remittitur in the case of a paraplegic man awarded $20,000,000 in noneconomic damages. He has permanent impairment of 92% of his whole person, has lost all voluntary control over his legs, bowel, bladder, and sexual function and suffers from a constant burning and pain sensation in his lower extremities. *Id.* at 551. His wife divorced him and he struggles with depression. He had suffered for over four years at the time of the award and had a life expectancy of 32-33 years. *Id.* He received $4,000,000 for past, and $16,000,000 for future, pain and suffering. *Id.* at 540.[18]

---

[18] See also *Jacobs v. Yale Univ.*, 2000 WL 1530030 (Conn. Super. Ct. 2000) ($10,000,000 noneconomic award for multiple severe injuries upheld (MOD.83 n.40)). In *Jacobs,* the trial court stated:

> Billy has been left blind and with profound impairments of his speech, the motor control of all four of his limbs, and his cognitive abilities. He must be intensively cared for by others throughout the remainder of his life. At the

The two other Connecticut jury cases cited by the court, *Cowles v. Doelger*, 2005 WL 4841411 (Conn. Super. Ct. 2005) ($16,500,000 noneconomic) and *D'Attilo v. Viscarello*, No. X10 UWY-CV-05-4010135-S (Conn. Super. Ct. 2011) ($50,000,000 noneconomic) (MOD.82), involving catastrophic birth injuries, yielded *no* judicial review.

The trial court analogizes these four horrific cases to this case:

> Those plaintiffs may have needed much more day-to-day assistance than Munn, but they faced the same level of social isolation as Munn without the burden of understanding what they had lost.

(MOD.82). These cases, in fact, have no resemblance to this case. While her injuries are serious, plaintiff is a student at a competitive college, traveling, working, and playing sports. Plaintiff's limitations cannot be compared to those suffered as a result of catastrophic birth injury or quadriplegic or paraplegic injuries that make it impossible to walk, use limbs, or engage in normal physical activities.

Not only are the other cases incomparable to plaintiff's case, the award here is far higher than all but one of those awards, and the one exception was never reviewed judicially. The court finds them comparable in amount by converting them

---

> same time, he has been left with a more or less normal life expectancy and with an acute awareness of what has happened to him.

*Jacobs,* 2000 WL 1530030, at *1.

56

into an annual rate based on life expectancy (MOD.83). *Oliveri v. Delta Steamship Lines, Inc.*, 849 F.2d 742, 749 (2d Cir. 1988), holds that future nonpecuniary as well as pecuniary loses should be discounted to present value. While Connecticut law is unclear, a court passing on an excessiveness claim should not simply divide the verdict by the number of years of life expectancy to come up with comparable annual rates.

The court abused its discretion in holding that those who were catastrophically injured at birth or suffered paraplegia or quadriplegia "present a similar constellation of injuries as Munn's" (MOD.82). The award of $31,500,000 for noneconomic damages shocks the conscience and thus is excessive.

## CONCLUSION

The judgment should be reversed and directed for the defendant. Alternatively, the judgment should be reversed and the case remanded for a new trial, or for a new trial unless plaintiff and her parents file a remittitur of the portion of the noneconomic award in excess of this Court's fair appraisal of damages.

RESPECTFULLY SUBMITTED,

DEFENDANT – APPELLANT

By _____

       Wesley W. Horton
       Karen L. Dowd
       Kenneth J. Bartschi
       Horton, Shields & Knox, P.C.
       90 Gillett Street
       Hartford, CT  06105
       (860) 522-8338

       Aaron S. Bayer
       Jeffrey R. Babbin
       Wiggin and Dana LLP
       265 Church Street
       New Haven, CT 06510
       (203) 498-4400

       *Attorneys for Defendant-Appellant*

STATEMENT PURSUANT TO FRAP RULE 32(a)(7)(C)

The undersigned hereby certifies that this brief, exclusive of the corporate disclosure statement, table of contents, and the table of authorities, uses a proportional typeface and is 13,982 words.

This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word, Version 2013 in Times New Roman 14 pt.


DATED:     October 14, 2014        _____
                                    Karen L. Dowd
                                    Counsel for The Hotchkiss School

# ADDENDUM



http://wwwn.cdc.gov/travel/destinationChina.aspx | Go

APR   MAY   SEP   Close

◄   **25**   ►   Help

92 captures
25 May 07 - 7 Sep 14

2006   2007   2008





S Room    A-Z Index    Contact Us



SAFER·HEALTHIER·PEOPLE™

# Travelers' Health

**Topics**

Destinations
Vaccinations
Travel Notices
Diseases
Mosquito and Tick Protection
Safe Food and Water
Illness and Injury Abroad
Travel Medicine Clinics
Yellow Book
Avian Flu and Travel
Yellow Fever Vaccinations Clinics
References and Resources

**Information for Specific Groups**

Traveling with Children
Cruise Ship and Air Travel
Special Needs Travel
Traveling with Pets

**Contact CDC**

Centers for Disease Control and Prevention
*National Center for Preparedness, Detection, and Control of Infectious Diseases (NCPDCID)*
Division of Global Migration and Quarantine
Call:

Travelers' Health Home > Destinations > China

## Health Information for Travelers to China

Email this page
Printer-friendly version

**On This Page**

**Travel Notices in Effect**
**Safety and Security Abroad**
**Preparing for Your Trip to China**
**Diseases Found in China**
**What You Need To Bring With You**
**Staying Healthy During Your Trip**
**After You Return Home**

Map - China



 **Map Disclaimer**

## Travel Notices in Effect

Update on the Global Status of Polio **Updated**: May 14, 2007

Human Infection with Avian Influenza A (H5N1) Virus: Advice for Travelers

**Updated**: February 02, 2007

Guidelines and Recommendations: Interim Guidance about Avian Influenza (H5N1) for U.S. Citizens Living Abroad **Updated**: February 02, 2007

Update: 2007 Measles and Mumps Outbreaks **Updated**: May 17, 2007

Top of Page

## Safety and Security Abroad

Transportation Security Administration
U.S. Department of State

Top of Page

## Preparing for Your Trip to China

**Before visiting China, you may need to get the following vaccinations and medications:**
(Note: Your doctor or health-care provider will determine what you will need, depending on factors such as your health and immunization history, areas of the country you will be visiting, and planned activities.)

To have the most benefit, see a health-care provider at least 4–6 weeks before your trip to allow time for your vaccines to take effect and to start taking medicine to prevent malaria, if you need it.

Even if you have less than 4 weeks before you leave, you should still see a health-care provider for needed vaccines, anti-malaria drugs and other medications and information about how to protect yourself from illness and injury while traveling.

CDC recommends that you see a health-care provider who specializes in Travel Medicine. Find a travel medicine clinic near you. If you have a medical condition, you should also share your travel plans with any doctors you are currently seeing for other medical reasons.

Although yellow fever is not a disease risk in China, the government requires travelers arriving from countries where yellow fever is present to present proof of yellow fever vaccination. If you will be traveling to one of these countries where yellow fever is present before arriving in China, this requirement must be taken into consideration.

**Be sure your routine vaccinations are up-to-date. Check the links below to see which vaccinations adults and children should get.**

**Routine vaccines**, as they are often called, such as for influenza, chickenpox, polio, measles/mumps/rubella (MMR), and diphtheria/pertussis/tetanus (DPT) are given at all stages of life; see the childhood and adolescent immunization schedule and routine adult

immunization schedule.

Routine vaccines are recommended even if you do not travel. Although childhood diseases, such as measles, rarely occur in the United States, they are still common in many parts of the world. A traveler who is not vaccinated would be at risk for infection.

| Vaccination or Disease | Recommendations or Requirements |
|---|---|
| Routine | Recommended if you are not up-to-date with routine shots such as, measles/mumps/rubella (MMR) vaccine, diphtheria/pertussis/tetanus (DPT) vaccine, etc. |
| Hepatitis A or immune globulin (IG) | Recommended for all unvaccinated people traveling to or working in China or other countries with an intermediate or high levels of hepatitis A virus infection where exposure might occur through food or water. |
| Hepatitis B | Recommended for all unvaccinated persons traveling to or working in China or other countries with intermediate to high levels of endemic HBV transmission (see map) and who might be exposed to blood or body fluids, have sexual contact with the local population, or be exposed through medical treatment, such as for an accident. |
| Japanese encephalitis | Recommended if you plan to visit rural farming areas and under special circumstances, such as a known outbreak of Japanese encephalitis. See map of areas with Japanese encephalitis. |
| Typhoid | Recommended for all unvaccinated people traveling to or working in China or other developing countries in South Asia, Africa, the Caribbean, and Asia, especially if visiting smaller cities, villages, or rural areas and staying with friends or relatives where exposure might occur through food or water. |
| Rabies | Recommended for travelers spending a lot of time outdoors, especially in rural areas, involved in activities such as, bicycling, camping, hiking, or work. Also, children are considered at higher risk because of their tendencies to play with animals and to not report bites. |

**Antimalarial Drugs**

If you will be visiting a malaria risk area in China, you will need to take one of the following antimalarial drugs: atovaquone/proguanil or doxycycline along the China-Burma border in the western part of Yunnan province; atovaquone/proguanil or doxycycline or mefloquine (primaquine in special circumstances and only after G6PD testing) in Hainan and the other parts of Yunnan province (see map). Chloroquine in all other areas.

**Malaria risk area in China:**

Travelers to cities and popular tourist areas, including Yangtze River cruises, are not at risk and do not need to take chemo prophylaxis. Rural areas only of the following provinces: Hainan, Yunnan, Fuijan, Guangdong, Guangxi, Guizhou, Sichuan, Tibet (in the Zangbo River valley only), Anhui, Hubei, Hunan, Jiangsu, Jiangxi, and Shandong. In provinces with risk, transmission exists in rural communities below 1,500 m only during

warm weather: north of latitude 33°N, July-November; between latitude 25°N and 33°N, May-December. South of latitude 25°N, transmission occurs year-round.

You may also view malaria information by region.

**Medicines you will need to bring with you on your trip:**

- **The prescription medicines you take every day.** Make sure you have enough to last during your trip, keep them in their original prescription bottles, and always in your carry-on luggage. Be sure to follow security guidelines, if they are liquids.
- **Medicine for diarrhea,** usually over-the-counter.
- See other suggested over-the-counter medications and first aid items for a travelers' health kit.

Note: Some drugs available by prescription in the US are illegal in other countries. Check the US Department of State Consular Information Sheets for the country(s) you intend to visit or the embassy or consulate for that country. If your medication is not allowed in the country you will be visiting, ask your health-care provider to write a letter on office stationery stating the medication has been prescribed for you.

**A Special Note about Antimalarial Drugs**

You should purchase antimalarial drugs before travel. Drugs purchased overseas may not be manufactured according to United States standards and may not be effective.

They also may be dangerous, contain counterfeit medications or contaminants, or be combinations of drugs that are not safe to use. Halofantrine (marketed as Halfan) is widely used overseas to treat malaria. CDC recommends that you do **NOT** use halofantrine because of serious heart-related side effects, including deaths. You should avoid using antimalarial drugs that are not recommended **unless** you have been diagnosed with life-threatening malaria and no other options are immediately available.

For detailed information about these antimalarial drugs, see Information for the Public: Prescription Drugs for Malaria.

Top of Page

## Diseases Found in China
**Risk can vary by region within a country; quality of in-country surveillance also varies.**

The following are disease risks that might affect travelers and is not a complete list of diseases that can be present. Risk can vary by regions within a country. Environmental conditions may also change and up to date information about risk by regions within a country may also not always be available.

## Malaria

**Malaria** is always a serious disease and may be a deadly illness. Humans get malaria from the bite of a mosquito infected with the parasite. Prevent this serious disease by seeing your health-care provider for a prescription antimalarial drug and by protecting yourself against mosquito bites (see below).

Travelers to malaria risk-areas in China, including infants, children, and former residents of China, should take one of the following antimalarial drugs listed above.

### Symptoms

Malaria symptoms may include

- fever
- chills
- sweats
- headache
- body aches
- nausea and vomiting
- fatigue

Malaria symptoms will occur at least 7 to 9 days after being bitten by an infected mosquito. Fever in the first week of travel in a malaria-risk area is unlikely to be malaria; however, you should see a doctor right away if you develop a fever during your trip.

Malaria may cause anemia and jaundice. Malaria infections with *Plasmodium falciparum*, if not promptly treated, may cause kidney failure, coma, and death. Despite using the protective measures outlined above, travelers may still develop malaria up to a year after returning from a malarious area. You should see a doctor immediately if you develop a fever anytime during the year following your return and tell the physician of your travel.

### Other Disease Risks

Dengue, filariasis, Japanese encephalitis, leishmaniasis, and plague are diseases carried by insects that also occur in this region. Protecting yourself against insect bites (see below) will help to prevent these diseases. Avian influenza is also present in China.

Outbreaks of severe acute pulmonary syndrome (SARS) occurred in mainland China, Hong Kong, and Taiwan in 2003. Avian influenza is present in the region.

For more information, see the Geographic Distribution of Potential Health Hazards to Travelers and Goals and Limitations in determining actual disease risks by destination.

Top of Page

## What You Need To Bring With You

- Iodine tablets and portable water filters to purify water if bottled water is not available. See Preventing Cryptosporidiosis: A Guide to Water Filters and Bottled

Water and Safe Food and Water (http://www.cdc.gov/travel/contentSafeFoodWater.aspx) for more detailed information
- Sunblock and sunglasses for protection from harmful effects of UV sun rays. See Skin Cancer Questions and Answers for more information
- To prevent insect/mosquito bites
  - Lightweight long-sleeved shirt, long pants, and a hat to wear outside, whenever possible.
  - Flying-insect spray to help clear rooms of mosquitoes. The product should contain a pyrethroid insecticide; these insecticides quickly kill flying insects, including mosquitoes.
  - Bed nets treated with permethrin, if you will not be sleeping in an air-conditioned or well-screened room and will be in malaria-risk areas. For use and purchasing information, see Insecticide Treated Bednets on the CDC malaria site. Overseas, permethrin or another insecticide, deltamethrin, may be purchased to treat bed nets and clothes.

Note: Check the Air Travel section of the Transportation Security Administration website for the latest information about airport screening procedures and prohibited items.

Top of Page

## Staying Healthy During Your Trip

### Prevent Insect Bites

Many diseases, like malaria and dengue, are spread through insect bites. One of the best protections is to prevent insect bites by:

- Using insect repellent (bug spray) with 30%-50% DEET. Picaridin, available in 7% and 15% concentrations, needs more frequent application. There is less information available on how effective picaridin is at protecting against all of the types of mosquitoes that transmit malaria.
- Wearing long-sleeved shirts, long pants, and a hat outdoors.
- Remaining indoors in a screened or air-conditioned area during the peak biting period for malaria (dusk and dawn)
- Sleeping in beds covered by nets treated with permethrin.
- Spraying rooms with products effective against flying insects, such as those containing pyrethroid.

For detailed information about insect repellent use, see Protection Against Mosquitoes and Other Arthropods in the Yellow Book.

### Be Careful about Food and Water

- Wash your hands often with soap and water. If soap and water are not available, use an alcohol-based hand gel (with at least 60% alcohol).

- Drink only bottled or boiled water, or carbonated (bubbly) drinks in cans or bottles. Avoid tap water, fountain drinks, and ice cubes. If this is not possible, learn how to make water safer to drink.
- Do not eat food purchased from street vendors.
- Make sure food is fully cooked.
- Avoid dairy products, unless you know they have been pasteurized.

Diseases from food and water often cause vomiting and diarrhea. Make sure to bring diarrhea medicine with you so that you can treat mild cases yourself.

## Avoid Injuries

Car crashes are a leading cause of injury among travelers. Protect yourself from these injuries by:

- Not drinking and driving.
- Wearing your safety belt and using car seats or booster seats in the backseat for children.
- Following local traffic laws.
- Wearing helmets when you ride bikes, motorcycles, and motor bikes.
- Not getting on an overloaded bus or mini-bus.
- Hiring a local driver, when possible.
- Avoiding night driving.

## Prevent Altitude Illness and Sunburn

If you visit the Himalayan Mountains, ascend gradually to allow time for your body to adjust to the high altitude, which can cause insomnia, headaches, nausea, and altitude sickness. If you experience these symptoms descend to a lower altitude and seek medical attention. Untreated altitude sickness can be fatal.

Use sunblock rated at least 15 SPF, especially at high altitudes, where the risk of sunburn is greater.

## Other Health Tips

- To prevent certain water-borne diseases such as schistosomiasis do not swim in fresh water (For more information, please see Swimming and Recreational Water Precautions.)
- To avoid bites and serious diseases (including rabies and plague) do not handle or pet animals, especially monkeys, dogs, and cats, If you are bitten or scratched, wash the wound immediately with soap and water and seek medical attention to determine if mediation or anti-rabies vaccine is needed.
- To avoid infections such as HIV and viral hepatitis do not share needles for tattoos, body piercing, or injections
- To reduce the risk of HIV and other sexually transmitted diseases always use latex condoms.
- To prevent fungal and parasitic infections, keep feet clean and dry, and do not go barefoot, especially on beaches where animals may have defecated.

Top of Page

## After You Return Home

If you have visited a malaria-risk area, continue taking your antimalarial drug for 4 weeks (chloroquine, doxycycline, or mefloquine) or seven days (atovaquone/proguanil) after leaving the risk area.

Malaria is always a serious disease and may be a deadly illness. If you become ill with a fever or flu-like illness either while traveling in a malaria-risk area or after you return home (for up to 1 year), you should seek **immediate** medical attention and should tell the physician your travel history.

## For Health-care Providers

Health-care professionals who require assistance with the diagnosis or treatment of malaria should call the CDC Malaria Hotline (770-488-7788) from 8:00 a.m. to 4:30 p.m. Eastern time. After hours or on weekends and holidays, health-care providers requiring assistance should call the CDC Emergency Operation Center at 770-488-7100 and ask the operator to page the person on call for the Malaria Branch. Information on diagnosis and treatment is available on the internet at http://www.cdc.gov/malaria.

## Important Note

This document is not a complete medical guide for travelers to this region. Consult with your doctor for specific information related to your needs and your medical history; recommendations may differ for pregnant women, young children, and persons who have chronic medical conditions.

Top of Page

Content Source: National Center for Preparedness, Detection, and Control of Infectious Diseases, Division of Global Migration and Quarantine
Page Last Reviewed: May 14, 2007
Page Last Modified: May 23, 2007
Page Created: May 14, 2007

Department of Health
and Human Services

Centers for Disease Control and Prevention, 1600 Clifton Rd, Atlanta, GA 30333, USA
Tel: 404-639-3311 • CDC Contact Center: 800-CDC-INFO • 888-232-6348 (TTY)